TOLEDO, PEORIA & WESTERN RAILROAD COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Toledo, P. & W. R. Co. v. Commissioner
Docket No. 2992-74.
United States Tax Court
T.C. Memo 1976-366; 1976 Tax Ct. Memo LEXIS 36; 35 T.C.M. (CCH) 1663; T.C.M. (RIA) 760366; December 2, 1976, Filed *36 Petitioner acquired real estate for reasons related to the operation of a railroad. Unneeded portions of the tracts acquired were held for several years, were only minimally improved, and were not advertised or promoted for sale. All real estate sales were initiated by purchasers and required approval of a state agency. Held, real estate sales by petitioner in 1965 and 1967 were sales of capital assets. Crane C. *37 Hauser and Arthur I. Gould, for the petitioner. James F. Hanley, Jr., for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined deficiencies of $32,764.24 and $21,723.31 in petitioner's Federal income taxes for the years 1965 and 1967, respectively. The only unresolved issue is whether net gains from real estate sales are taxable as capital gains or as ordinary income. FINDINGS OF FACT Some facts have been stipulated and are found accordingly. Petitioner, Toledo, Peoria & Western Railroad Company, a Delaware corporation with its principal office in East Peoria, Illinois, timely filed its income tax returns for the years in question with the District Director of Internal Revenue, Springfield, Illinois. Petitioner, authorized by the Interstate Commerce Commission to operate as a Class I railroad, owns and operates approximately 239 miles of main line track that extends through central Illinois to eastern Iowa. On its eastern and western terminals, petitioner's tracks connect with major railroads, thereby allowing petitioner to function as a "bridge carrier" for transcontinental rail traffic. Approximately *38 fifty percent of petitioner's business is transcontinental, neither originating nor terminating on its tracks. From 1957 through 1967, petitioner sold 42 parcels of real estate, totalling approximately 1,536 acres, to 27 different purchasers. During the same period, petitioner purchased 18 parcels of real estate, totalling approximately 293 acres, from 14 different sellers. In 1965 and 1967, the years before this Court, petitioner sold 12 parcels of real estate, reporting all as sales or exchanges of property under section 1231. [1] The respondent alleges that ten of the 12 sales gave rise to ordinary gain or loss. These ten sales were from three areas in the vicinity of Peoria, Illinois. The three areas, extending generally east to west, are referred to as the Yard area, the Messer area, and the Mapleton area. Pertinent facts relating to the ten sales follow: Year
Year
Gain (Loss) Area
Purchaser
Acres
Sold
Acquired
on Sale
Yard
American
Consumers
1.68
1965
1928
($ 822.61)
Yard
Rauenhorst Corp.
7.84
1967
1961
($1,368.01)
Messer
National Inns
2
1965
1928
$18,529.00
Messer
Altorfer Bros.
32
1965
1939, 1941
$13,872.23
Messer
Capital Plumbing &
Heating Co.
11.828
1967
1928,1941
$43,044.37
Messer
John Royster
.429
1967
1928,1929
($8,975.80)
Messer
Hagerty Bros.
1.704
1967
1941
($ 107.12)
Messer
Altorfer Bros.
24.608
1967
1939, 1941
($1,237.88)
Mapleton
Caterpiller
Tractor Co.
367.11
1965
1903, 1940
1941, 1956
1961
$130,269.68
Mapleton
Baird Chemical
Co.
25.203
1965
1856 (o88y i/
Co.
25.203
1965
1956
($3,881.20
*39 The first acquisitions of property in the Yard and Messer areas were made during 1928 and 1929 so petitioner could construct a freight classification yard and a separate mechanical repair facility.Before construction of the freight classification yard, but after purchasing extensive real estate in the Messer and Yard areas, the character of traffic traveling on petitioner's line shifted from predominantly local to predominantly transcontinental. Because of this shift in the character of traffic, maintenance of a large freight classification yard became unnecessary. Therefore, petitioner combined its freight classification yard and mechanical repair facility in the Yard area, leaving the Messer area unused. During the late 1930's, petitioner's management decided that the Messer property, if supplemented by additional adjacent property, could serve as the site of a barge terminal, providing a transfer point between rail traffic and river traffic on the nearby Illinois River. Petitioner therefore purchased additional Messer property during 1939 and 1941. Petitioner abandoned its intention to *40 use the Messer property as a barge terminal in 1941 when the City of Peoria constructed a barge terminal directly across the Illinois River from the Messer property. Except for minor additional purchases, all real estate acquisitions in the Yard and Messer areas occurred in 1928, 1929, 1939, or 1941. One minor purchase occurred in 1961 when petitioner purchased property in the Yard area so it could lay industrial track to service warehouses. The seller, a farmer, refused to divide his property and sell only the needed acreage, so petitioner purchased the farmer's entire acreage to obtain the needed right-of-way. The unneeded acreage was sold at a loss to Rauenhorst Corporation in 1967. Petitioner acquired property in the Mapleton area on several occasions. A large portion of property, used as a gravel pit, was acquired in 1903. During the early 1940's, additional Mapleton property was acquired so petitioner could alter its right-of-way and circumvent a steep hill that slowed steam powered rail traffic. Upon conversion to the more powerful diesel locomotive in the late 1940's, circumventing the hill was unnecessary, and petitioner stopped acquiring real estate for that purpose. *41 In 1956 petitioner purchased additional Mapleton property in order to complete a right-of-way to the Kingston River Terminal, a barge terminal servicing the Illinois River. Remaining purchases in the Mapleton area were to acquire right-of-way so petitioner could service strip mining regions should they be developed, and to obtain right-of-way through the town of Kingston Mines, located west of the Mapleton area, thereby providing petitioner access to a region of potential industrial development. As a public utility, petitioner has the power of eminent domain. Because eminent domain proceedings can be time consuming and expensive, however, petitioner has never chosen this method of acquiring right-of-way, but instead prefers to purchase property directly from its owners. Direct purchases, unlike acquisitions by eminent domain, frequently entail purchasing unneeded property adjacent to the desired right-of-way. The only significant improvement made to petitioner's property was the installation of a sewage and water main in the Messer area. This improvement was initiated by the Peoria Development Corporation, a civic organization and installed by the City of East Peoria. Petitioner *42 paid $5,000 for the improvements; the remaining cost, $25,000, was paid from the proceeds of property sold by petitioner. Although vehicular access roads were occasionally located in the Yard area, these were not constructed while petitioner owned the property. Petitioner displayed two signs on the Messer property. In their entirety these signs read, "New Industrial Park, Toledo, Peoria & Western Railroad Co." Petitioner has never otherwise advertised its property. Although petitioner on one occasion listed real estate with a broker, the non-exclusive listing, made at the broker's request, never resulted in a sale. All real estate sales have been initiated by prospective purchasers who contacted one of petitioner's employees. No single employee, however, is in charge of real estate sales, and the combined time spent annually by petitioner's employees on real estate activities is approximately one-tenth of one employee's time. Before petitioner may consummate a real estate sale it must obtain approval from the Illinois Commerce Commission. In its hearings, the Illinois Commerce Commission determines whether the proposed sales price is fair and reasonable, whether the sale *43 will interfere with the railroad's service to the public, whether the property is currently used for railroad purposes, and if not, why the property was initially acquired. On at least one occasion the Illinois Commerce Commission blocked a sale of petitioner's property. Petitioner prefers purchasers that will subsequently use rail transportation in their business. No purchaser, however, is required by contract to use rail transportation, and there is no assurance that the purchaser will prefer to transport goods by train rather than by the equally convenient and competitive barge or truck transportation. Indeed, for several reasons, some purchasers have not chosen rail transportation, or if they have, have not generated enough business to make rail service profitable to petitioner. OPINION The only issue we must decide is whether the real estate owned by petitioner was property held "primarily for sale to customers in the ordinary course of his trade or business" within the meaning of section 1221(1). Resolution of this issue determines whether petitioner's net gains from the sale of real estate are taxable as ordinary income or capital gain. [2]
*44 Section 1221 defines the term "capital asset" as property held by the taxpayer (whether or not connected with his trade or business), but does not include-- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *
The purpose of this section is "to differentiate between the 'profits and losses arising from the everyday operation of a business' on the one hand and 'the realization of appreciation in value accrued over a substantial period of time' on the other." [Citations omitted.] . Resolution of whether property is a capital asset is a factual problem, "depending on the unique combination of its particular facts." . Accord, . Courts generally consider several factors in determining if property was held primarily for sale to customers *45 in the ordinary course of a taxpayer's trade or business. Among these factors are: (1) the purpose for acquiring the property and the duration of the ownership; (2) the extent of the taxpayer's efforts to sell the property; (3) the number, extent, continuity, and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the time and effort the taxpayer devotes to the sales. ; , affg. ; ; . No single factor is determinative; all factors are considered in forming an opinion of the entire situation presented. Upon considering the entire record before us, and considering the factors commonly considered by courts, we conclude that the real estate sold by petitioner was not held primarily for sale to customers in the ordinary course of its trade or business. Our initial *46 inquiry is into the motives for acquiring the real estate. Petitioner alleges that the property was acquired for reasons associated with the railroad's business of transportation: Messer properties were acquired successively for a freight classification yard and for a barge terminal site; Mapleton properties were acquired for right-of-way needed to circumvent a steep hill located in the Mapleton area, for access to the Kingston River Terminal, and for right-of-way through the town of Kingston Mines; Yard area properties were acquired for a mechanical repair facility, freight classification yard, and for industrial trackage leading to rail users property. Although respondent expresses general skepticism over petitioner's motives for acquiring property in the Messer area during 1939 and 1941, respondent makes no specific charge that any of the Messer property was acquired for non-railroad purposes. In contrast, respondent contends that all Mapleton property acquired after 1955 was acquired primarily for the purpose of reselling to customers in the ordinary course of trade or business. In making this contention respondent outlines the following argument: If petitioner needed right-of-way *47 in the Mapleton area, it could obtain the required property through eminent domain proceedings. In an eminent domain proceeding, however, it is necessary to show a public need for rail service along the desired right-of-way. This, respondent alleges, petitioner could not do. Therefore, since there was no public need for right-of-way, property acquired in the Mapleton area was acquired primarily for some other reason. This other reason was for sale to customers who would then establish industries, generating rail traffic, thereby creating a reason for extending petitioner's trackage. Respondent therefore contends that Mapleton area real estate was acquired primarily for resale to customers and only secondarily to extend petitioner's tracks. Respondent contends that the Yard property acquired in 1961 and sold in 1967 was not purchased primarily for industrial trackage as alleged by petitioner. Respondent bases his contention on facts "(though not supported by the record)" and recognizes his position is speculative, but believes it is "both responsible and legitimate" to speculate why petitioner acquired the property. Of the ten parcels in question, the majority of the property *48 was acquired during the years 1903, 1928-1929, and 1939-1941. Property acquired during these periods was for a gravel pit, a mechanical repair facility, a freight classification yard, and for access to, and construction of, a barge terminal. We conclude that all of these parcels were acquired for purposes intimately connected with the business of owning and operating a railroad. The remaining parcels in question were acquired in the Mapleton area in 1956 and 1961, and in the Yard area in 1961. Portions of all property acquired in the Mapleton area during 1956 and 1961 lie directly on petitioner's right-of-way to the Kingston River Terminal, and on petitioner's right-of-way through the town of Kingston Mines.At trial petitioner presented evidence that right-of-way could be acquired either through eminent domain proceedings or through direct purchase on the open real estate market. Petitioner's management considered the possibility of eminent domain proceedings to acquire right-of-way, but rejected this method as too expensive and too time consuming. Consequently, petitioner has never used eminent domain proceedings to acquire right-of-way. In light of this evidence we find unpersuasive *49 respondent's argument that failure to use eminent domain proceedings proves petitioner acquired the Mapleton area property primarily for sale. Were we to extend respondent's argument to property outside the Mapleton area, we would be drawn to the unreasonable conclusion that all property acquired throughout petitioner's history was acquired primarily for sale to customers. Finding respondent's argument unpersuasive, we conclude that real estate acquired in the Mapleton area during 1956 and 1961 was acquired primarily to obtain right-of-way needed in petitioner's business of transportation. Petitioner presented evidence that the Yard area property purchased in 1961 was part of a larger parcel acquired so petitioner could lay industrial trackage to service warehouses. Respondent now attempts to rebut petitioner's alleged reasons for purchasing this property with "facts" not in the record that support "both responsible and legitimate speculation" that the real estate was not purchased in order to lay industrial trackage. Respondent's attempted rebuttal is unpersuasive and we conclude that the Yard area property purchased in 1961 was acquired for purposes related to the business of *50 running and maintaining a railroad, and not primarily for sale to customers. In addition to the reasons for acquiring the real estate, other factors persuade us that the real estate was not held primarily for sale to customers in the course of a trade or business. First, all of the property was held for several years; most was held for greater than 25 years. Second, petitioner's efforts to sell the real estate were minimal. It never advertised in any publication, it never approached potential purchasers with offers to sell, and only once did it employ a real estate broker. This employment was at the broker's request, and no sales resulted from the broker's activities. The only possible attention brought to its property was the placement of two signs stating, "New Industrial Park, Toledo, Peoria & Western Railroad Co." No telephone numbers were stated, and no additional information was given. Of course, a lack of substantial advertising does not preclude a determination that petitioner was holding property primarily for sale to customers in the ordinary course of business. . It is merely one factor to be considered in *51 the context of the particular case. Third, during the years in question petitioner sold 12 parcels of real estate, 10 of which respondent contends should be accorded ordinary gain or loss. On occasion we have allowed capital gain treatment to a greater number of sales. ; . We have also accorded ordinary income treatment to a lesser number of sales. , affg. a Memorandum Opinion of this Court. The number of sales in this case does not persuade us that petitioner was actively engaged in a real estate business. Fourth, development and improvement of petitioner's property was minimal. Respondent points to the improvement on the Messer property, consisting of a $30,000 sewage and water main, as evidence that the property was held primarily for sale to customers in the ordinary course of a real estate business. This improvement, although primarily financed through the proceeds of petitioner's real estate sales, was neither initiated nor installed by petitioner. Other improvements, including *52 vehicular access roads, were of a less substantial nature. These improvements are insignificant both in number and cost when placed in the context of a company owning several thousand acres, and do not persuade us that the property was held primarily for sale. Finally, we note that petitioner devoted little time and attention to real estate transactions: no single employee was in charge of real estate transactions, and no specific location was designated for conducting real estate business. Upon considering the reasons for acquiring the real estate sold by petitioner in 1965 and 1967, the period of time the real estate was held, the improvements, promotional activity, number of sales, amount of time devoted to real estate transactions, and upon considering petitioner's and respondent's arguments in support of their respective positions, as well as the record as a whole, we conclude that none of the real estate sales during 1965 and 1967 involved property held primarily for sale in the ordinary course of business. Therefore, we conclude that net gains from petitioner's real estate sales are taxable as capital gains. Since the parties have settled other matters, Decision *53 will be entered under Rule 155. Footnotes
1. All statutor references are to the Internal Revenue Code of 1954, as amended.↩
2. At trial and on brief petitioner argued that the real estate involved was a capital asset. In its Federal income tax returns, however, petitioner recorded the real estate transactions as sales of section 1231 property.Petitioner has provided no explanation for this discrepancy.Whether petitioner contends the real estate was a capital asset or a section 1231 asset, we must determine if the property was held primarily for sale to customers in the ordinary course of petitioner's trade or business. See sec. 1231(b)(1)(B).↩